We'll hear counsel in Joe v. Atty Gen. You'll have to list who you might be. Good morning, Your Honors. My name is Julia Pack and I represent Petitioner in this appeal. And do you want to reserve any time for rebuttal? I would like to request for that four minutes be reserved for rebuttal. Okay. Ebony. Thank you. Your Honors, we're before this court today because Petitioner believes that the BIA's final order of removal is unsustainable and should be overturned. In critical part, it would appear that the government agrees. Yeah, the government, I mean, the government agrees with you as far as I can tell. The only difference is what we should remit. That's how I understand it as well. And as I understand the issue, the sole issue that divides us is whether the court must remit to give the BIA another chance to evaluate what we submit as the ample and uncontested evidence of Egypt's deteriorating country conditions. That's how to get around Ventura. I believe Ventura is distinguishable on several bases. Well, we know in no way dispute the general legal principles counseling deference to an agency's fact-finding expertise or the construction of statutes that it's charged with administering. Well, I mean, what Ventura says, they get the first shot. That's right. But she's willing to do that. I mean, oh, no, that's right. You want us to affirm. We can't do that. No, no, we don't want an affirmance. No, no, you want us to reverse. Exactly. We can't do that. The Supreme Court has said we can. Well, as I understand Ventura, the issue there was that the Supreme Court believed that the Ninth Circuit had usurped the BIA's opportunity to evaluate country conditions evidence. In that case, procedurally, the IHA had determined that the petitioner was not credible and then said that country conditions, in any event, had not improved such that the finding of just – I'm sorry. That's okay. Take your time. Okay, certainly. The BIA decided when it was affirming the IHA that it was affirming the adverse credibility determination and it deemed the applicant deportable and thereby it did not need to reach the evidence of change in improving country conditions. The Ninth Circuit, in reversing the credibility determination and finding that the petitioner would be subject to persecution, also took the extra step and determined that, in any event, country conditions had not improved in Guatemala. We believe that the situation is different here because the IJ did have an opportunity to look at country conditions. We don't think their analysis was necessarily robust, but the IJ heard a great deal of testimony from one of the leading authorities on human rights abuses in Egypt. The IJ actually credited that expert's findings and stated that he did believe there are significant human rights abuses that occur in Egypt on a basis that is certainly too often, and that includes torture, and that he did believe the record supported that the government does seem to have an antipathy towards homosexual men. The problem was not that the evidence was not before the IJ, but when the IJ, when confronted with it, totally misapplied the law by, among other things, allowing his concerns about petitioner's credibility, in fact, what was supposed to be objective CAD analysis, by a novel and legally unsustainable statistical analysis. What specifically does the government agree should, or suggest should be remanded? As I understand it, the government would like this case to be submitted back to the BIA solely to examine the deteriorating country conditions situation in Egypt since 2001, since petitioner left the United States. And you're saying that there's a host of other things that you've brought up that they've not responded to, and if there is to be a remand, then there should be a remand on everything. Is that right? That's correct. And in addition to that, I also believe that the BIA had an opportunity to contest the IJ's findings about the country conditions, and they did not do that. They said they had reviewed the record and that they were adopting and affirming the IJ's decision. So if there had been any, if they hadn't had an issue with the IJ's characterization of the country conditions as being actually quite difficult for gay men, they could have raised that at that time, and they declined to do so. Precisely what is it that you would have considered on remand beyond the deteriorating country conditions? Certainly. I think that the lower courts committed a number of legal errors, and the problem is that they seem to all infect one another. Principally, with respect to country conditions, both the IJ and the BIA failed to disassociate their concerns about petitioner's credibility from the likelihood that petitioner would be subjected to torture based on the country conditions. Can I ask you something about that? That's your argument with regard to the CAT claim? Yes. Do they have to make the same disassociation with regard to the INA withholding claim? No, no, they don't, as I understand it. I think, though, that there were a number of other errors that were committed with respect to the withholding claim. Number one, both the IJ and BIA looked at the past instances in which petitioner had been attacked in Egypt and said, while they may constitute isolated instances of harassment, they don't rise to the level of persecution. We think that this is clearly wrong under the prevailing law in this circuit. In two instances, petitioner was attacked in Egypt, in the first instance by a school principal, in the second instance by police. He was severely beaten. He was hospitalized on both occasions for long periods of time, and he testified that he had lasting physical harm as a result of that. The school principal can't necessarily be imputed to the government, can he? No, we're not submitting that he can't. Although, in that instance, somebody reported the attack to the police. The police showed up and apparently told petitioner that he should try to become normal, like other children, and that it was his fault that he had been attacked. We think that this signifies that the Egyptian government was unwilling to protect him from instances of persecution, and that that meets the standard for a government's action in persecution. I believe that the second instance was committed by the police. The IJ has argued that it wasn't in a custodial setting, but I do not think that that is relevant for purposes of persecution analysis. And I would submit that based on these instances of past persecution alone, the IJ and the BIA should have established a rebuttable presumption of future persecution, which, given the recent crackdown against gay men in Egypt, would be impossible to overcome. I also believe that with respect to the withholding claim, that the IJ failed to differentiate between the standard for withholding, which requires a clear probability of future persecution, from the higher standard required to show that an applicant would be tortured in the future. The BIA failed to disassociate those findings, and all of his language seems to suggest that he was only considering whether petitioner would face the prospect of future torture. We submit that he is likely to be both persecuted and tortured in the future, but in the very least, the IJ and BIA should have considered the lesser standard for establishing INA withholding. Additional errors that we submit were committed by the IJ with respect to the cat finding. The IJ discussed petitioner's expert testimony about the prevalence of torture in Egypt, but then he engaged in what's essentially a novel and legally unsustainable statistical analysis, where he asked the expert how many arrests he personally was aware of, and the expert said he knew of 180 names over the course of three years. And then that IJ extrapolated from that. Were they ostensibly homosexual men, the 180 names? I'm sorry, I didn't hear that. What was the 180 names that the expert said? I believe the expert said that he knew of 180 names of people who had been arrested and whose names had been sent to prosecutors. This is homosexual men? Yes, yes. It does not appear in Egypt that there is a similar crackdown against a gay woman. The IJ, taking the 160 people, divided it by what he calculated to be the percentage of gay men in the Egyptian population, which he would estimate to be essentially 10% of the Egyptian population of 70 million, and on the basis of that calculation said it was impossible for him to understand how any particular gay man could be subject to torture. We believe this ignores the clear mandate that CAT is an individualized analysis that looks at whether the particular applicant would be subjected to torture in the country of removal. And we think that here there's a number of critical facts that suggest that Petitioner would be highly susceptible to that. First, he's been identified as a gay man. Whether or not one believes the past attacks rise to the level of persecution, in any event, he has been identified on that basis and violently targeted for the mere offense of being gay. Secondly, what the IJ and NBI fail to give proper credit to is that the applicant would be returning to Egypt as a returning asylum seeker from a Western nation. He has a notation on his passport now that says that he applied for asylum in the United States, and Petitioner's expert witness testified that this would make him additionally suspect for interrogation and possibly detention at an Egyptian airport. Whether or not this would be on the basis of him returning as a homosexual or as a Western asylum seeker is inconsequential for the CAT analysis, because under the Convention Against Torture, the court is instructed to consider both the likelihood that somebody would be tortured on the five enumerated grounds, but also if they would be tortured on some other basis. We submit when these facts are combined, his history of being persecuted as a gay man and the fact that he would be returning from a lengthy stay in a Western nation would make him additionally susceptible to detention and possibly and probably persecution and or torture. Thank you.  Good morning. You may plead the court. Vanessa Lafour for the Attorney General of the United States. Ms. Lafour, you're not on the brief. No, I did not write the brief. That's correct. I'm just making an appearance separately. Okay. Yeah. Are you from OIL? I am. I'm from the Office of Immigration and Legation. Correct. Yes. It's nice because sometimes we get tax lawyers up here who are arguing for the government in immigration cases, and they know less than we do. Right. Although you didn't do the brief, maybe you can tell us why the government chose not to respond to many, all but one of the arguments that were made by the petitioner. Well, the reason for that is the issue that we've stated that needs to go back to the board is material to the rest of the issues. And any and all of these arguments that the petitioner is raising here before this court can be briefed before the board. The board can take a look at those. Including the adverse credibility determination? I do believe so, yes. So then you don't differ. I don't quite understand the difference. If you say that on remand everything can come before the board, why do you want such a limited remand? I mean, what difference is it going to make? It's just the way that we phrased our remand motion. We believe that that's the seminal issue that was not addressed by the board. We're not agreeing that all these other mistakes were made by the board or by the immigration judges. Nobody suggests that you are. The only question is when it goes back, what does it go back to? So what you're saying is while you can go back and may contest some of the points that have been brought up, you have no problem having a remand cover all of those points? What I'm saying is that it should be remanded for this issue to be decided by the board, which is material to the rest of the issues. My question to you is which issue? The issue of whether or not the deteriorating country conditions can and will affect his... So what about adverse credibility determination, which was... In other words, the petition for review mentions adverse credibility determination that the IJ and BIA improperly allowed those determinations to preclude cat relief. They challenged the cat analysis. I could go on and on. Right. You're saying that all of these things are open to be argued before the IJ or BIA on remand. Is that correct? I'm saying that all those issues can be briefed by petitioner if they feel it needs to be heard again. They've already filed a brief to the board. Our main concern here is that the board didn't decide the issue, which is whether or not country conditions in Egypt have deteriorated significantly since 2001. But if they go back, let's just make sure we understand each other. Yes. If they filed a brief, whoever on the government side chose not to respond, that means it's waived. So I assume... Your Honor, I disagree with that. I don't believe that it is waived. We're here on a motion to remand. We haven't addressed the merits of the claim of any of the rest of... But we're also here on their petition for review. That's correct. However, we believe and under the Attorney General's decision to remand is a function of his duties under the immigration laws as stated. But come back to the petition for review. Right. If there's a petition for review and it has 10 points and you respond to one of them, that means you waive the other nine, right? No, that's not correct. Not correct? We're not waiving anything. We're just saying that there's an issue that the board didn't decide. But if you're not waiving it, don't you file a brief on it? I mean, the brief does... It only covers one of them. You're right because we're still arguing for remand. We feel that this case needs to go back to the board for it to decide that issue. That issue is material to the rest of petitioner's claim of withholding for removal and withholding for removal under the Convention Against Torture. The way it normally works is that the government would say, okay, we agree that argument X should be remanded. Correct. We do not agree that arguments Y, Z, A, B, C, D, E, F should be remanded and here is why. It seems incongruous at this time for the court to decide or start deciding or for us to even address some of the issues and then also say in conjunction with that, well, this other issue needs to be remanded. All of those issues are pertinent and if petitioner chooses to brief them before the board, they can do so. That's part of the way that this works. Okay. In that case, what will the government do? You alleged that... It sounds to me like you can dispute them, I suppose, before the board maybe. But what will you say before the board when it goes back? Your Honor, we don't represent the department. The Department of Homeland Security is the entity that represents the government before the Board of Immigration Appeals. What will DHS say? I can't speak for DHS. I don't represent DHS here before this court and that's something that they would have to handle on their own. But here before this court, the Attorney General's decision to remand, like I said earlier, is a function of his duties conferred to him by Congress to administer the immigration laws. And I do believe that both yourself and Judge Sloverter have both acknowledged that Ventura does apply here. And here the issue, the seminal issue, we believe is... But the question is what do we remand? Do we remand all ten issues or whatever, eight or just the one? As a matter of law, you can remand whatever it is that you like. We're suggesting that you shouldn't because that suggests that you've made an issue and you've decided that... But if you're agreeing that we shouldn't, why did you file a brief arguing that we shouldn't? Because we feel that addressing those at this point would be sort of addressing half the case and then at the same time saying, well, the whole thing needs to go back because this issue may and can affect the rest of the issues in this case. It seems to me that we hadn't granted the motion for remand before this argument. Correct. So we need to address... If we send a remand back saying all you have to do is look at country conditions, that kind of implies we agree that you can conflate the INA withholding from the CAF claims, we agree that this kind of statistical analysis is proper, all those things. I mean, it seems to me that what we need here, if you say that they are to have a wide open chance to brief all this, what we have to do is say we remand this entire matter back to the board, period. And then you can do what you want. Otherwise, we have to address these issues. Right. And we're not suggesting that you should address these issues at this time because... You can't. We don't have your position on them. You're correct. You don't have my position on it. But my suggestion is that because the issue that we've stated wasn't decided by the board and it's material to his withholding of CAF claims, all those other issues can be briefed before the board. They can rehear those again. Yeah. I think we understand your position. Okay. Well, in conclusion, Your Honor, we request that this court grant our motion to remand. Should the court deny our motion to remand, we would request additional time to file a supplemental brief addressing the merits of this claim. Okay. Thank you. Thank you. You were saved rebuttal time. Do you have rebuttal? I do, yes. Are you sure? I'd just like to mention one thing. It is our position that the government has waived their opposition to all of the legal errors that we identified. We fully briefed a motion to remand, and that was referred from the motions panel to this panel. And the government had an opportunity to submit a reply brief. In that reply brief, they never contested any of these legal errors. We think that these legal errors, I mean, we're perfectly happy for this to go back to the board on all issues, but we think that it is possible for this court to reverse the legal determinations and send it back to the board for further proceedings consistent with that directive. Thank you. Thank you. Tell me something. Tell her something. I noticed that you were pro bono here. That's right. And so we thank you for that. Are you with an organization or with a law firm? Yeah, we're with the law firm of Skadden Arps, Sleipner and Fon. I see. And this is one of their pro bono reasons. Yes. Thank you. Skadden Arps, is that a big firm? Okay. Thank you very much. Thank you. Thank you all. Thank you. Thank you. We will now hear.